UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>FOR THE USE AND BENEFIT OF<br>3L LEASING | CIVIL ACTION |
| VERSUS | NO. 14-2539 |
| RUSSEL GRILLOT, ET AL. | SECTION "K"(1) |

## ORDER AND REASONS

Before the Court is a Motion for Partial Summary Judgment Against Grillot Construction, LLC (Doc. 23) and a Motion For Summary Judgment Against U.S. Specialty Insurance Company (Doc. 24). Having reviewed the pleadings, memoranda, exhibits the relevant law, and having conducted a pretrial conference in this matter, the Court finds that there are material questions of fact which preclude the granting of these motions. As such, the Court **DENIES** both motions.

**FACTUAL BACKGROUND**

On April 23, 2013, defendant Grillot Construction contracted with the U.S. Army Corps of Engineers ("USACE"), as general contractor, for a project referred to as "Grand Isle and Vicinity, Hurricane Protection Project, Dune Repair and Armory" ("Project"). Grillot Construction and defendant U.S. Specialty Insurance Company ("U.S. Specialty"), as the Miller Act surety, posted a payment bond in the amount of $2,545,838.00, pursuant to 40 U.S.C. § 3131. Plaintiff 3L was the owner of the spud barge MR. BOB (the "Vessel"). Grillot Construction bareboat chartered the Vessel at the rate of $50,000.00 a month from 3L for use on the Project on July 17, 2013.  An On Charter Survey was completed by C. Breit Marine Services

LLC ("Breit") on July 17, 2013.  (Report No. 1307272). (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "a"-"h," at 8-9 of 29 pages).

During Grillot Constructions's charter of the Vessel, it used and/or consumed items which had been placed onboard the Vessel by 3L.  Section 8 of the Charter Party provides as follows with respect to same:

> SECTION 8–INVENTORIES, CONSUMABLE OIL AND STORES
>
> (a) A complete inventory of Vessel's entire equipment, outfit, appliances, and of all consumable stores on board the Vessel shall be made by Charterer in conjunction with Owner on Delivery and again on Redelivery of the Vessel.  Charterer and Owner, respectively, shall at the time of Delivery and Redelivery take over and pay for all bunkers, lubricating oil, water and unbroached provisions, paints, oils, ropes and other consumable stores in the Vessel at the then current market prices at the ports of delivery and redelivery, respectively.
>
> (b) In the event there is a lesser amount of bunkers on board the Vessel at the time of its Redelivery to Owner from that on board at the time of the Delivery of the Vessel to Charterer, Charterer shall then and there pay to Owner an amount equivalent to the gallons of bunker differential multiplied by the per gallon market price of the bunkers at the port and time of Redelivery.

(Doc. 23-4 at 161 of 222).

While working on the project, the Vessel sustained damages on about October 28, 2013 which caused the Vessel to break free from its position and sustain damage to one of the Vessel's spuds and hull.  (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "i" at 9 of 29 pages).  The Charter provides in relevant part as follows as with respect toresponsibility for damage and repairs during the course of the contract:

> SECTION 6–REPAIRS AND ALTERATIONS

      (a)    During the Term, the Charterer shall at all times maintain and preserve the Vessel in good running order and repair, in accordance with good commercial maintenance practices in all respects which a prudent operator of vessels of similar size, design and class to the Vessel, except ordinary wear and tear, so that the Vessel shall be, in so far as due diligence can make it so, tight, staunch, strong and well and sufficiently tackled, appareled, furnished, equipped and in every respect seaworthy and in good operating condition in accordance with all applicable requirements and all other applicable laws, regulations and directives and able to perform the functions for which the Vessel was originally intended, all at Charter's own cost and expense.

SECTION 11- LOSS AND DAMAGE

    Until the Vessel is returned to Owner as provided in this Charter, all risks of physical damage to or loss, destruction or interference with the use, seizure or confiscation shall impair Charterer's obligation under this Charter.

    If any item of the Vessel is rendered unusable as a result of any physical damage to, or loss or destruction of, the Vessel, Charterer shall give to Owner immediate notice thereof and this Charter shall continue in full force and effect without any abatement of Charter Hire. Charterer shall determine, within three (3) days after the date of occurrence of such damage or destruction, whether such item of the Vessel can be repaired. In the event Charterer determines that such item of the Vessel can be repaired, Charterer shall cause such item of the Vessel to be promptly repaired. In the event Charterer determines such item cannot be repaired, Charterer shall promptly replace such item of Vessel with items of at least equal value and utility, and convey title to such replacement to Owner free and clear of all liens and encumbrances, and this Charter shall continue in full force and effect, including such replacement, as though such damage or destruction has not occurred. In the event Charterer determines that the Vessel cannot be repaired or replaced, the Charter shall pay to Owner, on the next Charter Hire Payment date, the full replacement value of the Vessel on such Charter Hire payment care, together with any Charter Hire then due and upon such payment, Charterer's obligation to Pay Charter Hire hereunder shall cease.

(Doc. 23-4 at 160 and 165 of 222). Despite the damage, the Vessel was able to complete the charterer's mission, with substantial completion of the Project ((See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "j", at 9 of 29 pages) apparently occurring on November 25, 2013.

The Vessel was moved from the Project site to various docks where the spud and hull repairs were performed. The timing of the movement of the vessel to these docks and the efforts made for the repair thereof are somewhat unclear.  What is clear is that:

(1) in December of 2013, Grillot Construction arranged for the vessel to be towed from the Project site to Crown Point Shipyard ("Crown Point"); (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "l", at 9 of 29 pages).

(2) at Crown Point one of the vessel's spuds was removed to be repaired; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "m", at 9 of 29 pages).

(3) Grillot Construction arranged for the damaged spud to be transported to and repaired at Hardrock Marine Services, LLC ("HMS"); (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "n", at 9 of 29 pages).

(4) the spud was repaired at HMS and returned to the vessel; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "o", at 9 of 29 pages).

(5) thereafter the vessel was towed to a dock near American Tugs, Inc. for an Off-Charter Survey sometime in April of 2014; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "p", at 9 of 29 pages).

(6) extensive structural damage was found that had not been present at the time of the charter; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "q", at 10 of 29 pages).

(7) Grillot Construction notified its insurance carrier to file a claim and to effect these repairs; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "r", at 10 of 29 pages).

(8) there were issues with timely the provision of a docking plan by 3L; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "s"-"v", at 10 of 29 pages).

(9) the ship was moved to FMT Shipyard & Repair, L.L.C.; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "w", at 10 of 29 pages).

(10) another survey was conducted on the vessel resulting in a "Damage Survey" prepared by Breit on May 22, 2014 (Report No. 1405115); (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "x", at 10 of 29 pages).

(11) issues concerning the bunkers and whether the fuel compartment was contaminated arose thereafter; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "y"-"z", at 10-11 of 29 pages).

(12) Another Off-Charter Survey was conducted on August 17, 2014, which then resulted in 13 items that were "necessary to repair" that were "not associated with the damages sustained to the port side shell of the barge or the breaking of the starboard forward spudwell;" (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "bb", at 11 of 29 pages).

(13) The Vessel was returned to 3L on August 27, 2014; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "aa", at 11 of 29 pages).

(14) Another inspection resulting in an Off-Charter Addendum Survey was conducted by Breit on August 29, 2014, (Report 1408345) which resulted in more specific findings as to the fuel level and the deck winch for spud operation; (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "cc", at 11 of 29 pages).

(14) An Off Charter Addenedum Survey ("styled C Breit Marine Services, LLC's Survey Report # 1405182) was brought to American Tugs to estimate the cost to repair or replace those items (except the cost of fuel); (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "ff", at 11 of 29 pages)

(15) American Tugs prepared an estimate that included (i) the Off Charter Addendum Survey 12 point list, (ii) an estimate for the cost to remove the remaining 20" of fuel; and (iii) the cost to repair the clyde deck winch for a total amount of $31,235.00; (Doc. 23-13). (See Doc. 42, Joint Pre-Trial Order, Undisputed Facts "gg"-"hh", at 11 of 29 pages)

(16) Grillot Construction did not pay monthly charter hire from December 18, 2013 to August 27, 2014 which in accordance to the Bareboat Charter equals an amount of past due charter hire of $450,000.00.

In addition, 3L contends that because the Vessel was redelivered in an unusable state, under the terms of the Charter, Grillot owes 3L Charter Hire from the time the Vessel was returned to the present date (that amount being $550,000.00) or for a reasonable amount of time after the Vessel was returned. The relevant provisions in the Charter Contract with respect to this claims are as follows:

SECTION 2 - DELIVERY AND REDELIVERY

    (b)    <u>Redelivery</u>

    At the expiration of the Term of this Charter pursuant to Section 3 hereof, or upon termination of this Charter pursuant to Section 19 hereof, Charterer shall at its expense . . ., return the Vessel to Owner at Belle Chase, Louisiana at a dock designated by Owner, free of all liens and encumbrances other than any such liens and encumbrances created by owner.  Charter hire . . . shall continue during the entire period of charter until the Vessel has been redelivered by Charterer to owner.

(Doc. 23-4 at 158 of 222) However, it must be noted that the Charter Party also contains the following provision:

SECTION 15 - CONSEQUENTIAL DAMAGES

    Neither owner nor Charterer shall be responsible hereunder for prospective profits or for special, indirect or consequential damages.

(Doc. 23-4 at 167 of 222).

Based on these facts, plaintiff maintains that there are no material questions of fact at issue and that Grillot Construction is liable to 3L for the following:

a)     charter hire up to the time the Vessel was redelivered in the amount of $450,000.00;

b)     necessary repairs and replenishment of consumables and inventories used while chartered in the amount of $57,842.35;

c)     all fuel consumed or contaminated while under charter ($70,000.00);

d)     charter hire from the time the vessel was returned to the present date ($550,000.00);

e)     costs and expense related to enforcing its rights and remeides under the Charter, including attorney fees and costs and marine surveyor costs and fees ($65,000.00 combined);[1] and

---

[1] This item of damages is based on the following provision:
SECTION 21- EXPENSES OF OWNER
    Charterer shall pay Owner all costs and expenses, including reasonable attorneys' fees

(f)     pre- and post-judgment interest on all amounts due.

3L seeks compensation as well from U.S. Specialty which issued a payment bond which provides specifically that its obligation is void if Grillot "promptly makes payment to all persons having aa direct relationship with [Grillot] for furnishing labor, materials or both **in the prosecution of the work provided for in** [the subject contract].  Specifically, 3L contends that U.S. Specialty is liable as a matter of law for:

(a)     fuel and other consumables which have not been replenished;

(b)     all necessary repairs;

(c)     unpaid charter hire;

(d)     loss of profit;

(e)     a penalty in the amount of 50% the amount found to be due from U.S. Specialty; and

(f)     attorney's fees, court costs, and interest.

**Standard for Motion for Summary Judgment**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco*, 76 F.3d 651 (5th Cir.1996),  citing *Skotak v.*

---

and court costs, incurred by owner and exercising any of its rights or remedies hereunder or enforcing any of the terms, conditions or provisions of this Charter.
See Bareboat Charter, Doc. 23-4 at 171 of 222.

*Tenneco Resins, Inc.*, 953 F.2d 909, 912-13 (5th Cir.), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).   When the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.   The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."   *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir.1995).

"A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Pylant v. Hartford Life and Accident Insurance* Company, 497 F.3d 536, 538 (5th Cir. 2007) quoting *Anderson  v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Summary judgment evidence must be "viewed in the light most favorable to the nonmovant, with all factual inferences made in the nonmovant's favor." *Bazan ex rel Bazan v. Hildago County*, 246 F.3d 481, 489 (5th Cir. 2001), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513.

> [C]onclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment.  The Court has no duty to search the record for material fact issues.  Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim.

*RSR Corporation v. International Insurance Company*, 612 F.3rd 851,857 (5th Cir. 2010).

**Analysis**

Clearly, the facts of this case are so contested that it is impossible for summary judgment to be entered as to either defendant.  It is unclear to what extent 3L's actions caused delays in the repair of the spud and the hull.  Its actions could affect the liability that defendants would have for Charter Hire for the pre-redelivery period.  Likewise, the issues surrounding a) the fuel tank, b) the need for its "repair," and c) whether the fuel was actually contaminated sufficiently to render the remaining bunkers unusable make that claim incapable of judgment.  Moreover, 3L's failure to mitigate and to take any reasonable actions so as put the Vessel in commerce after redelivery in a reasonable period of time make unavailable 3L's claim for Charter Hire post-redelivery as a subject for summary judgment.  Clearly these contentions likewise render 3L's claims for penalties and attorneys fees not the proper subject for summary judgment.  Moreover, U.S. Specialty's liability is likewise intertwined with these contested facts.

The Court notes that there are several issues of law which have not been addressed by pretrial motion.  This case would have been substantially more streamlined had the issues of law been presented to the Court prior to trial.  Thus, there are not only questions of fact but questions of law which must now be resolved at trial.  Accordingly,

**IT IS ORDERED** that the Motion for Partial Summary Judgment Against Grillot Construction, LLC (Doc. 23) and the Motion For Summary Judgment Against U.S. Specialty Insurance Company (Doc. 24) are **DENIED**.

New Orleans, Louisiana, this 7th day of October, 2015.

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**